# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
COOK, TELLITOCCI[1], and HAIGHT
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist THOMAS D. MOELLERING**
**United States Army, Appellant**

ARMY 20130516

Seventh Army Joint Multinational Training Command
Joshua S. Shuey, Military Judge
Lieutenant Colonel David E. Mendelson, Staff Judge Advocate

For Appellant: Captain Patrick A. Crocker, JA (argued); Colonel Kevin Boyle, JA; Lieutenant Colonel Peter Kageleiry, Jr., JA; Major Vincent T. Shuler, JA; Captain Patrick A. Crocker, JA (on brief).

For Appellee: Captain Timothy C. Donahue, JA (argued); Colonel John P. Carrell, JA; Major Daniel D. Derner, JA; Captain Timothy C. Donahue, JA (on brief).

29 June 2015

---------------------------------
MEMORANDUM OPINION
---------------------------------

COOK, Senior Judge:

A panel consisting of officer and enlisted members sitting as a general court-martial convicted appellant, contrary to his pleas, of sexual assault, abusive sexual contact, and adultery, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 934 (2012) [hereinafter UCMJ].[2] The convening authority approved only so much of the adjudged sentence that includes a bad-conduct discharge and 180 days of confinement.

This case is before us for review pursuant to Article 66, UCMJ. Appellant has assigned several errors. Two of these assigned errors, challenges to the factual and

---

[1] Judge Tellitocci took final action in this case prior to his departure from the court.

[2] Appellant was found not guilty of an additional charge of adultery.

legal sufficiency of appellant's convictions under Article 120, UCMJ, merit discussion. Moreover, relief is warranted based on the factual insufficiency of appellant's conviction for abusive sexual contact.

**FACTS**

On the night of 1 September 2012, appellant and Private First Class (PFC) AW went to a bar in Grafenwoehr, Germany. Appellant and PFC AW were friends and consumed alcoholic beverages while they waited for the arrival of a mutual friend, Private E-2 (PV2) AP. The three were members of the "Cowboy Crew," a group of junior soldiers stationed in Vilseck or Grafenwoehr. Once PV2 AP arrived, all three drank multiple alcoholic beverages and danced. Private First Class AW drank liquor quite heavily and as a result vomited repeatedly throughout the night. Because PFC AW's barracks room was located in Vilseck, she arranged with PV2 AP to stay in her barracks room in Grafenwoehr after their night of drinking. Appellant was responsible for driving all three to PV2 AP's barracks.

Although appellant was married, his relationship with PV2 AP included regular sexual activity. Private AP explained to PFC AW that appellant would be spending the night in her room, but that PFC AW was welcome to stay in a spare room attached to PV2 AP's barracks room.

At trial, PFC AW testified that during the car ride from the bar to the barracks a conversation about prospective sexual activities among the three ensued, wherein, PFC AW stated, "[appellant] was not allowed to touch [her]" and that "only [PV2 AP]" was allowed to touch her. The reason for making this declaration, according to PFC AW, was that "earlier that night [appellant] touched my butt, and I just didn't want him touching me at all . . . ." Although appellant initially denied hearing this declaration when interviewed by Army Criminal Investigation Command (CID) agents, he subsequently admitted to CID that PFC AW had made a statement to this effect while appellant, PFC AW, and PV2 AP were in the bar that night. In addition, appellant described a conversation that involved himself, PFC AW and PV2 AP wherein PFC AW consented to PV2 AP touching her and PV2 AP stated she was comfortable with engaging in sexual activity that included appellant and PFC AW. At trial, PV2 AP denied ever hearing PFC AW make this statement and denied being involved in a conversation that covered the "ground rules," as it were, for sexual activity about to take place in her room.

All agreed that PFC AW and PV2 AP "made out" in the back seat of the car as the three friends traveled to the barracks. According to PFC AW, this was not the first time the two had kissed. To the contrary, "there [was] a group of us girls that . . . when we get drunk we kiss . . . ." When the three arrived at PV2 AP's barracks room, the sexual activity escalated.

2

According to PFC AW's testimony, the activity began with her and PV2 AP continuing to "make out" and then undressing and performing oral sex on each other while on PV2 AP's bed. Both PFC AW and PV2 AP stated that this sexual activity was consensual. Although PFC AW and PV2 AP had no clothing on while engaging in oral sex, PFC AW did not recall how clothing was removed. Private First Class AW remembered that appellant and PV2 AP had sexual intercourse on PV2 AP's bed. Appellant was on top of PV2 AP while PFC AW was also lying in the bed "between them and the wall," watching a movie on a computer that sat on a table in PV2 AP's room. According to PFC AW's testimony, it was then, with all three sharing a bed and nude, that appellant "just grabbed" her breast. Appellant did so without warning and without PFC AW's consent. It was this touching that served as the basis for appellant's abusive sexual contact conviction.

After having her breast grabbed, PFC AW pushed appellant's hand away, but did not leave PV2 AP's bed. Appellant then resumed sexual activity with PV2 AP and did not attempt to touch PFC AW's breast again. However, while the three friends were still sharing PV2 AP's bed, appellant placed a finger inside of PFC AW's vagina. Appellant was originally charged separately for this touching, but the specification was not referred to court-martial, presumably because PFC AW could not remember if this event occurred during her testimony at the Article 32, UCMJ, pretrial investigation hearing. When asked at trial about this lapse, PFC AW attributed it to not getting enough sleep the night before the hearing.

Private First Class AW testified she got appellant to stop the digital penetration by telling him to stop. The next thing PFC AW remembered was PV2 AP getting off the bed and going into a bathroom. At this point, PFC AW recalled appellant getting on top of her and placing his penis inside her vagina. After PFC AW told appellant two separate times to stop, appellant withdrew his penis from PFC AW's vagina. This served as the basis for appellant's conviction for sexual assault against PFC AW by bodily harm.

Private First Class AW maintained she had not consented to or requested any sexual contact with appellant. On cross-examination, PFC AW admitted to not remembering a lot of the details surrounding what happened in PV2 AP's room due to her high level of intoxication. She did remember consensually re-engaging in oral sex with PV2 AP after appellant had grabbed her breast. She did not remember performing oral sex on appellant that evening.

After PFC AW told appellant to "stop" a second time, he got off of her and went into the bathroom with PV2 AP. Private First Class AW then got dressed and left PV2 AP's room. She called her ex-boyfriend, Sergeant (SGT) RH, who lived close-by to PV2 AP, and asked to meet outside SGT RH's building.

3

Sergeant RH testified at trial that when he met PFC AW outside his building she was crying, her face was red and she appeared "pretty traumatized." He further stated on direct examination that PFC AW told him she "had been raped over in the other building."[3] Sergeant RH, a military policeman (MP), stated he was intoxicated at the time he met with PFC AW and therefore did not want to "delve too much into" the allegation by asking who had assaulted her or what had happened. However, he flagged down a passing on-duty MP, PVT ZS, and instructed him to take PFC AW back to Vilseck, and to not do anything against her will but allow her to do whatever she needed to do. Sergeant RH was concerned that taking PFC AW to the MP station in her current intoxicated state would be counter-productive.

Private ZS testified at trial and described encountering PFC AW and SGT RH outside his building around 0345 on the night in question. He stated that PFC AW was upset and crying and that SGT RH asked him to take PFC AW back to her barracks in Vilseck, but did not mention receiving additional guidance from SGT RH. Private ZS further testified that on the trip from Grafenwoehr to Vilseck, "you could tell something was wrong with [PFC AW]," as she cried and breathed heavily, but she did not talk about what was bothering her. Private ZS dropped PFC AW off at her barracks and then continued his shift. He next encountered PFC AW later that morning after she had walked into the Vilseck MP station and reported the sexual assault. Private ZS described PFC AW as still being upset and crying.

Agents from CID were then contacted and as part of their investigation they arranged for the collection of AW's clothing, as well as a physical exam to include the collection of biological evidence. Ms. DB, a forensic DNA examiner, testified at trial that the analysis of AW's cervical swab identified the presence of semen and that appellant's DNA matched this sample.

Appellant called PV2 AP during the merits portion of his case in chief. Contrary to PFC AW's testimony, PV2 AP denied that any conversations took place between her, PFC AW and appellant concerning limitations on sexual activity that could take place in her room. She agreed that she and PFC AW kissed and got "touchy/feely" in the back seat of the car during the drive from the bar to her room.

Private AP testified that once back in her room, she and appellant were the first two into bed and were kissing when PFC AW got into bed and started kissing PV2 AP. At that point, appellant moved to the end of the bed while the two females continued to kiss. According to PV2 AP, PFC AW then initiated vaginal intercourse with appellant by mounting him. While this transpired, PV2 AP then re-positioned

---

[3] On cross examination, SGT RH agreed that in a previous statement made to criminal investigators he had said that PFC AW told him she had been "touched."

herself to facilitate appellant's ability to perform oral sex on her while having vaginal sex with PFC AW. After this position, both PV2 AP and PFC AW performed oral sex on appellant, with PFC AW both initiating this sexual act and bragging that "this is how you do it" as she performed oral sex on appellant.

Next, according to PV2 AP, PFC AW laid down on the bed and implored the appellant to "[f]--- me like a dirty slut." Appellant then got on top of PFC AW and had vaginal intercourse with her. Sometime after this act, PFC AW and PV2 AP engaged in oral sex. Then, appellant and PV2 AP agreed to try anal sex for the first time. While appellant then proceeded to have anal sex with PV2 AP, she performed oral sex on PFC AW. Private AP admitted to falsely telling CID that she and appellant were engaged in vaginal sex during this position because she was embarrassed about admitting she had engaged in anal sex. At trial, PV2 AP testified that the anal penetration hurt her and she cried and asked appellant to stop. Appellant stopped and consoled PV2 AP by wrapping her in a blanket and then the two proceeded into the bathroom together. It was while appellant and PV2 AP were in the bathroom that PFC AW got dressed and left the room.

Private AP averred appellant had no opportunity to be alone with PFC AW in her bedroom during this incident. To the contrary, PV2 AP claimed to have been present during the entire event. Private AP further stated that at no point did PFC AW express any kind of reservation about the sexual activity that had transpired between the two women and appellant. Soon after PV2 AP realized PFC AW had left her room, she sent PFC AW a text message stating that: appellant had sexual intercourse with PFC AW; PV2 AP had performed oral sex on PFC AW; they were both drunk; PV2 AP was still a little drunk; and appellant having sexual intercourse with PFC AW "won't happen again." In regards to this latter message, PV2 AP clarified at trial what she meant by this statement was that she "knew that [PFC AW] had wanted to have sex with [appellant] and I figured . . . she got away with this one, [so] she might try again." In the text message, PV2 AP also asked PFC AW where she had gone and that she was "Lmao[4] . . . ."

In response to PV2 AP's text, PFC AW and PV2 AP engaged in the following conversation via text messaging:

> PFC AW: I told [you] I didn't want it to happen before he did it ... [and] I told him [too]. I don't know why he didn't [sic]. I told him I was only touching [you].

---

[4] *Merriam-Webster's* online dictionary defines "LMAO" as an abbreviation for "laughing my ass off." *Merriam-Wesbster*, http://www.merriam-webster.com/dictionary/lmao (last visited 25 June 2015).

> PV2 AP:  Don't worry about it.  We [were] drunk and [stuff]
> happens [just] as long as I was there.  Don't touch him
> when I'm not around.  Where did [you] go anyway?
>
> PFC AW:  No.  I didn't [want to] f--- him!  And I went home.
> No, [stuff] like that [doesn't] happen.
>
> PV2 AP:  Dude, we were drunk.  Home as in Vilseck?
>
> . . . .
>
> PV2 AP:  I don't know [what you] did or said to the boys but
> they are all pissed and [blowing] up my phone so [I'm
> going to] tell [them] what happened.

On cross-examination, government counsel confirmed with PV2 AP that her testimony was: (1) before sexual activity began in her room, no ground rules had been established and that she never heard PFC AW express any reservations about having sex with appellant; and (2) she never heard PFC AW tell appellant to stop while appellant was having sexual intercourse with PFC AW.

As part of its impeachment of PV2 AP on these issues, the government confronted her with a statement appellant made to CID.  In regards to whether any sexual activity ground rules had been previously established, government counsel offered appellant's statement wherein he stated that while at the bar:

> [PV2 AP] . . . said [PFC AW] was going back with us tonight.
> I looked at [PV2 AP] and asked if she was okay with it
> and she said yes.  I asked [PFC AW] if she was okay with
> it and she said yeah.  I said the three of us together
> and [PV2 AP] said yes and [PFC AW] said no, with [PV2 AP] yes,
> but not you and me.  I told [PV2 AP] this is not a good idea,
> something's wrong and she said it was fine, not a big
> deal and that I worry too much.

When confronted with this statement, PV2 AP agreed that even though her memory was "crystal clear" on the night in question, she was surprised that appellant would allege this conversation took place because she did not remember it but offered that she "probably wasn't paying attention."  Upon further questioning, PV2 AP remembered that appellant had asked her if it was okay for PFC AW to stay in her room that night.  Private AP further admitted to not mentioning this statement during appellant's Article 32, UCMJ, hearing.

Additionally, government counsel questioned PV2 AP concerning appellant's statement to CID wherein he stated that while he "was having sex with [PFC AW] she told me no, stop." She again expressed surprise that appellant would allege PFC AW made that statement because she did not recall PFC AW making it. When asked to explain this discrepancy, PV2 AP offered that it "[m]ight have been something that I didn't hear."

Pursuant to Military Rule of Evidence 106, appellant introduced his second statement into evidence. In addition to the two inconsistencies noted above, appellant described the sexual positions he, PFC AW and PV2 AP engaged in fairly consistently with PFC AP's trial testimony, with some discrepancies as noted below.

In regards to admitting that PFC AW had at one point told him to stop, he stated he was having vaginal intercourse with PFC AW from behind when she told him "no, stop" and then he stopped. Private PV2 AP, in her testimony, did not mention that appellant and PV2 AW had engaged in this particular position or that PFC AW had ever said "no" or "stop." It was after this position that appellant alleged PV2 AP and PFC AW performed oral sex on him, which was consistent with PV2 AP's trial testimony, to include statements attributed to PFC AW by PV2 AP. Pursuant to appellant's statement to CID, the reason he had initially lied about PFC AW not telling him "no" or to "stop" was because PFC AW then reinitiated sexual activity with him and he thought she was just saying no to a particular position and not to the sexual activity in general. Appellant then stated he and PV2 AP engaged in anal sex, which resulted in PV2 AP experiencing pain, ending the sexual activity. Notably, despite consent obviously being at issue during his second interview with CID, appellant failed to mention that PFC AW had urged him to "f--- her like a dirty slut," as alleged by PV2 AP.

Appellant's theory at trial was that PFC AW consented to all of the sexual activity in PV2 AP's room. In an attempt to offer a motive for why PFC AW would falsely claim appellant sexually assaulted her, appellant offered a theory that Specialist Adam W—a soldier PFC AW was having a casual sexual relationship with, but with whom PFC AW wanted to have a more serious relationship—would end their relationship if he learned she had consensual sex with appellant. When asked about this eventuality taking place, PFC AW testified that she "knew whenever I reported it I was going to lose all of my friends."

## LAW AND DISCUSSION

In accordance with Article 66(c), UCMJ, we review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J.

7

324, 324-25 (C.M.A. 1987); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). In resolving questions of legal sufficiency, we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." (*United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are [ourselves] convinced of the accused's guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325.

Having completed our review of the legal and factual sufficiency of appellant's convictions, we begin by affirming appellant's conviction for adultery. In reviewing appellant's convictions for sexual assault and abusive sexual contact, we are presented with a choice between PV2 AP's and PFC AW's description of what happened in PV2 AP's room. In evaluating PFC AW's testimony, we find two portions corroborated by appellant to be particularly persuasive.

First, PFC AW claims to have told both appellant and PV2 AP before arriving at PV2 AP's room that she would consent to engaging in sexual acts with PV2 AP but not with appellant. Appellant, in his second statement to CID, corroborated PFC AW's testimony by admitting that he heard PFC AW make a statement to this effect before arriving at PV2 AP's. In addition, appellant's response to CID as to why he had initially lied about this conversation, that he "didn't think about it" and "didn't think it was that big of a thing" rings hollow and indicates a consciousness of guilt. Contrary to appellant's assertion, while not definitive, we find PFC AW's statement to appellant and PV2 AP that she was only consenting to engage in sexual activity with PV2 AP and not appellant to be persuasive as to whether PFC AW consented to sexual activity with appellant. *See United States v. Prather*, 69 M.J. 338, 343 (C.A.A.F. 2011).

Second, appellant corroborated PFC AW's claim that she told appellant to stop having sexual intercourse with her while in PV2 AP's room. Again, when confronted with his first statement wherein he failed to acknowledge that PFC AW had told him to stop, appellant attempted to minimize this falsehood by interpreting PFC AW's "stop" to mean she merely wanted to change sexual positions. Because PFC AW claims she told appellant to stop touching her at least three times while in PV2 AP's room, once when appellant placed his finger in her vagina and twice when appellant put his penis in her vagina, appellant's account does not completely mesh with PFC AW's. However, appellant's corroboration that PFC AW did go over ground rules with him and PV2 AP prior to sexual activity commencing, combined with his agreement that PV2 AW said stop at least once while in PV2 AP's room, casts doubt on the veracity of PV2 AP's testimony.

Private AP, although claiming to have a "crystal clear" memory concerning the night in question, alleged: (1) not hearing PFC AW's discussion of the ground rules; and (2) also not recalling PFC AW ever said no or stop to any sexual activity in PV2 AP's room. As to the former claim, appellant's second statement to CID casts even more doubt on the veracity of PV2 AP's testimony. Specifically, appellant alleged PV2 AP participated in this ground rules conversation, wherein PV2 AP said she was fine with having sex with both appellant and PFC AW and tried to allay appellant's concerns by telling him it was not a big deal and that he worried too much. These two major inconsistencies cause us to review PV2 AP's testimony that PFC AW consented to all sexual acts performed with appellant with a jaundiced eye.

Further, PV2 AP's portrayal of PFC AW as not only consenting to all sexual acts that transpired in AP's room, but acting as an aggressor, instructor, and cheerleader is difficult to reconcile with the almost inconsolable and sobbing person that immediately emerged once she departed PV2 AP's room. The text messages sent between PV2 AP and PFC AW soon after the incident demonstrate PFC AW's lack of consent to sexual acts performed on her by appellant. The texts also served to put PV2 AP on notice that PFC AW was upset by the incident, was not prepared to attribute appellant's actions to a night of drunken revelry, but rather was prepared to allege she was sexually assaulted. In total, we find PFC AW's account alleging sexual assault to ring truer than PV2 AP's explicit tale of sexual adventure.

However, we are not ourselves convinced beyond a reasonable doubt that appellant did not hold, as a result of mistake an incorrect but reasonable belief, that PFC AW had consented to the abusive sexual contact complained of, specifically breast touching.

Looking at the scenario broadly, as described by PFC AW, that appellant, PV2 AP and PFC AW all agreed to spend the night in PV2 AP's room. All three were under the impression that sexual activity between appellant and PV2 AP was going to occur and that PFC AW was going to be present during this encounter. In addition, based on words and deeds, all three were under the impression that PV2 AP and PFC AW were going to engage in some amount of unspecified sexual activity. Into this mix of three people agreeing to engage in sexual activity in each other's presence, PFC AW injected her desire to limit her sexual participation to interaction with PV2 AP.

Although in some scenarios this prior notice of limited participation in three-person sexual acts may prove sufficient to sustain an abusive sexual contact conviction, here we find this notice lacking based on PFC AW's subsequent actions. Specifically, PFC AW's decision to remain nude in the same bed with appellant and PV2 AP while appellant and PV2 AP engaged in vaginal intercourse could well have led appellant to reasonably conclude, albeit mistakenly, that PFC AW was interested

in some sexual activity that included appellant. We further note the prosecution has the burden of proving beyond a reasonable doubt that mistake of fact as to consent did not exist in appellant's case. We find the government failed to meet this heavy burden and appellant's conviction for abusive sexual contact is factually insufficient.

However, in affirming appellant's conviction for sexual assault, we find the mistake of fact defense to be insufficient based on PFC AW's responses to appellant's actions. Specifically, although we have applied the mistake of fact defense to excuse appellant's first sexual touching involving PFC AW, we will not extend it further because: (1) PFC AW brushed appellant's hand away when he grabbed her breast; (2) PFC AW told appellant to stop when he penetrated her vagina with his finger and (3) PFC AW had to tell appellant two distinct times to stop having sexual intercourse with her before he complied. In sum, any mistake of fact that appellant reasonably possessed as to PFC AW's desire to participate in sexual acts with him when he first touched her breast ceased to exist before he placed his penis into her vagina, and remained deficient after he did so.

## CONCLUSION

On consideration of the entire record, the finding of guilty to Specification 2, Charge I is set aside and dismissed. The remaining findings of guilty are AFFIRMED. We are able to reassess the sentence on the basis of the error noted and do so after conducting a thorough analysis of the totality of circumstances presented by appellant's case and in accordance with the principles articulated by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986). In evaluating the *Winckelmann* factors, we find no dramatic change in the penalty landscape that might cause us pause in reassessing appellant's sentence. Additionally, the nature of the remaining offenses still captures the gravamen of the original offenses and the circumstances surrounding appellant's conduct. Finally, based on our experience, we are familiar with the remaining offenses so that we may reliably determine what sentence would have been imposed at trial. We are confident that based on the entire record and appellant's course of conduct, the panel would have imposed a sentence of at least that which was adjudged.

Reassessing the sentence based on the noted error and the remaining findings of guilty, we AFFIRM the sentence as adjudged. We find this reassessed sentence is not only purged of any error but is also appropriate. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by our decision, are ordered restored.

Judge TELLITOCCI concurs.

10

HAIGHT, Judge, concurring in part and dissenting in part:

I concur with the majority's affirmance of appellant's adultery conviction. I also concur with setting aside the finding of guilty to abusive sexual contact for touching Private First Class (PFC) AW's breast. However, I disagree with the majority regarding appellant's sexual assault conviction as I would set aside that finding of guilty as well.

The evidence in this case does not reveal a rape or sexual assault; it reveals a ménage a trois. In the bluntest of terms, three people voluntarily entered into a hedonistic, self-indulgent experience and, as a result, the legal system was called upon to essentially officiate a bacchanalian debauch.

Be that as it may, appellant was not charged with or convicted of an indecent act, open and notorious sexual activity, or committing a sexual act on one too intoxicated to consent. Instead, he stands convicted of having sex with PFC AW by causing her bodily harm. That conviction is insufficient and I would not affirm it. *See* UCMJ art. 66.

Appellant and PFC AW were friends and went to a bar in order to "hang out," drink, and wait for Private E2 (PV2) AP, who was PFC AW's best friend and appellant's mistress. Despite being married to another, appellant had sex with PV2 AP two to three times a week and knew he and PV2 AP would be returning to her room that night to have sex. Private AP finished her military police duty shift, went to the bar, and they all danced and drank alcohol. Private First Class AW and PV2 AP agreed that appellant would drive all of them to PV2 AP's barracks room and that all of them would spend the night there. Then, as appellant drove to the barracks, PFC AW and PV2 AP kissed, "made out," and touched each other in the back seat.

Upon arriving at PV2 AP's barracks room, they all got undressed in front of each other and increased sexual activity began. According to PFC AW, the two females engaged in mutual cunnilingus as appellant observed until he joined them and started having sexual intercourse with PV2 AP as PFC AW remained next to them on the bed, observing them, and watching television.

Appellant's and PV2 AP's versions of events are somewhat different from PFC AW's account in that they both relate that appellant and PV2 AP were initially kissing or having sex on the bed and it was PFC AW who then joined in. Furthermore, they both describe PFC AW as then getting on top of appellant, straddling him, and having vaginal intercourse with him as he simultaneously performed oral sex on PV2 AP, as she straddled his head while the two females faced each other. As the three moved through various sexual positions and combinations, at one point, PFC AW and PV2 AP simultaneously performed oral sex

11

on appellant, with PFC AW tutoring PV2 AP on that particular sex act. According to appellant and PV2 AP, this sexual escapade culminated with appellant having anal intercourse with PV2 AP from behind as she simultaneously performed oral sex on PFC AW. This act caused PV2 AP pain so they stopped, and PV2 AP and appellant left PFC AW on the bed and went into the adjacent bathroom. This is when PFC AW got dressed, left the room, went next door to her ex-boyfriend's room, and first reported that she had been "touched" by appellant and that that she had not wanted him to do so.

Contrary to appellant and PV2 AP's view that all sexual activity that occurred between the three was either consented to or initiated by PFC AW, PFC AW claimed that some of appellant's acts, performed in the midst of this sexual bedlam, were not consented to by her. She testified that after she and PV2 AP performed oral sex on each other in front of appellant, appellant and PV2 AP engaged in sexual intercourse as she lay next to them. As appellant was having sex with PV2 AP, he reached out and "grabbed" PFC AW's breast without her express prior permission. According to PFC AW, she pushed his hand away and he continued to have sex with PV2 AP. Private First Class AW did not get up from the bed, say anything, or leave the room.[5] While still having sex with PV2 AP, appellant then inserted his finger into PFC AW's vagina. Private First Class AW testified that *after* appellant had inserted his finger, she told him to stop as it was uncomfortable and he did stop. After this particular touching, PFC AW and PV2 AP re-engaged in various sexual positions and mutual oral sex, all occurring concurrently with appellant's sexual activity with PV2 AP. According to PFC AW, PV2 AP eventually went to the bathroom a few feet away with the door possibly remaining open, leaving appellant and her on the bed. The direct examination of PFC AW regarding the sexual assault was the following:

> Q. Okay. What is the next thing that you do remember after [PV2 AP] went to the bathroom?
>
> A. [Appellant] getting on top of me.
>
> Q. Where were you laying at this point?
>
> A. I was up against the wall?
>
> Q. What happened after he got on top of you?

---

[5] Private First Class AW testified that she did not get off the bed while appellant and PV2 AP engaged in sexual activity because she found herself between them and the wall and "[t]here really wasn't a way for me to get off the bed."

12

A. All I remember is him sticking it inside of me and then he went to the bathroom with [PV2 AP].

. . . .

Q. Break that down for us. How did that happen?

A. Like, I don't remember how he got on top of me. All I remember is him being on top of me, sticking it in me.

. . . .

Q. How did you let him know that this is not acceptable?

A. I told him to stop.

Q. How forcibly did you tell him to stop?

A. I told him a couple of times to stop.

. . . .

Q. On the first time, did he stop?

A. No, ma'am.

Q. So, after how many times did he eventually stop?

A. Two times, ma'am.

. . . .

Q. How long – and correction, let me back up. Can you remember details about how he eventually got off of you?

A. No, ma'am.

On cross-examination, PFC AW did not deny performing oral sex on appellant or "doing anything" with him that night. Rather, she conceded there is much that occurred that night that she does not remember as she was "pretty drunk."

In affirming appellant's sexual assault conviction, the majority determines that PV2 AP's account lacks credibility for two reasons. First, as opposed to PFC AW, she does not recall the laying down of any strict and rigid so-called "ground rules" for the three's upcoming night of sexual adventure. Second, she does not remember PFC AW ever saying "stop" to appellant, although he admits in one of his statements that PFC AW did say "stop" at one point with respect to a particular sexual position. I do not parse the three different memories of that night's string of sexual activity with as fine a blade as the majority does.

The majority attributes an ironclad quality to the supposed "ground rules" that defies any practical expectation or real-world application to an arena as fluctuating as human sexual interaction. Private First Class AW's testimony regarding the "ground rules" was, "Me and [AP] were talking and she said that I could stay in her spare room and use the cover that I have at her room, because [appellant] was going to be staying with her that night." She also said that she remembers making it clear that appellant was not to touch her. It was not so "clear" to appellant and PV2 AP.

In fact, PFC AW herself contradicts any notion that the planned sexual activity was clear-cut and predetermined by agreeing on cross-examination that "So, more or less there wasn't a formal plan" and that the escalation of sexual activity was "just something that naturally came about." If anybody violated the pre-set "ground rules," it was PFC AW when she did not retire to the spare room but instead voluntarily interjected herself into another couple's predetermined night of sex. On the stand, PV2 AP agreed with PFC AW that all that happened was not the result of any "formal plan to fool around," but all "just happened naturally." Furthermore, PV2 AP did not recall any formal discussions as to who would do what to whom or who was precluded from doing what to another. Appellant, in a sworn statement, acknowledged there was some nebulous conversation in which he expressed some misgivings about all three of them going back to PV2 AP's room where he knew sexual activity would occur. Private AP assuaged his concern by stating, "We'll go about our business and if it happens it happens and if it doesn't it doesn't." As it turns out, "it" happened.

Regardless of how firm the "ground rules" PFC AW may have thought them to be, they did not survive the shifting sexual events of that night. If the law recognizes that prior consent can be withdrawn, then it surely must also recognize that prior nonconsent can change over time and transform into consent, given fluid circumstances and the "heat of the moment." *See United States v. Prather*, 69 M.J. 338, 343 (C.A.A.F. 2011).

The majority seems to fault PV2 AP for not being able to recall that PFC AW said "stop" at one point. They view this lack of memory as diminishing her credibility because even the appellant admitted in his second statement that PFC AW uttered that word. I, on the other hand, find PV2 AP's insistence that she never

heard or saw anything that would indicate a lack of consent on PFC AW's part as credible. If PFC AW's account is accurate, then PV2 AP was not even in the same room and had removed herself from the sexual activity when PFC AW said "stop." If appellant's account is accurate, then PV2 AP was in the throes of sexual pleasure when PFC AW said "stop," not to cease sexual activity, but to rearrange sexual positions. Either way, I find appellant's and PV2 AP's accounts far more credible than PFC AW's story that she could not remove herself from the bed and the sexual scenario in which she found herself, not due to fear, threats, intimidation, physical restraint, or any show of force, but because she did not want to inconvenience her two friends having sex beside her by getting out from between them and the wall.

The majority has difficulty reconciling the idea that PFC AW consented to all of that night's sexual activity with the "almost inconsolable and sobbing person that immediately emerged once she departed PV2 AP's room."[6] I hasten to point out that it was not the defense's burden to explain why PFC AW behaved after the fact as she did, but it was the government's job to prove beyond a reasonable doubt not only that PFC AW did not consent to the sexual act but also that appellant did not make a reasonable mistake of fact that she consented. In my opinion, the government failed to meet this burden and, therefore, I respectfully disagree with the portion of the majority's decision affirming appellant's conviction for aggravated sexual assault.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[6] Although the defense was under no burden to show why PFC AW claimed she did not consent to sex with appellant, it was made clear at trial that PFC AW, at the time of the incident, was in a physical relationship with one of appellant's friends, Specialist Adam W, and wanted that relationship not only to continue but to evolve into one more serious. Specialist Adam W testified that he had specifically informed PFC AW that "if she were to sleep with [appellant], that our physical relationship would end and I would cease that contact with her."